Castle v. American International Group, Inc. Thank you. 422-2764. Mr. Woofter, am I correct if you reserve two? Yes, thank you, Your Honor. Okay, and I can already tell I'm going to need you to speak in the microphone. Good morning, Your Honors. Daniel Woofter appearing on behalf of Plaintiff Appellant Aaron Katzel. This is a case in which the district court clearly failed to apply the summary judgment standard in ruling for AIG a mere three days after my client submitted his opposition brief and over 1,250 pages of competing record evidence in an opinion that doesn't even address all of my client's legal claims, let alone all his arguments. I'll start by focusing on the primary retaliation claim. We seek to present evidence to the jury showing that Mr. Katzel was an excellent longtime employee of AIG who was fired because he called for an investigation as part of the company's annual SOX fraud risk assessment into specific failures he witnessed of internal controls that the SEC itself required AIG to implement in 2006 to avoid fraud prosecution. During his decade with AIG, Mr. Katzel was tasked with helping to develop and implement those internal controls under the guidance of the SEC's independent monitor. As we will argue to the jury, this shows not only that Mr. Katzel subjectively believed he was reporting a likely SOX violation. Okay, but can you explain to me what your, I mean, first, your client was a compliance lawyer. That's correct, right? And so he had, he should have had a heightened sense of what constituted legal activity. Is that fair? He wasn't a compliance lawyer at AIG, but I do agree that he had expertise in securities law. Okay, and so given that, what did he think he was, or what would be reasonable, what would be objective for him to think that he was doing by signing the certification that he didn't observe fraud? So he said he didn't observe specific instances of fraud that would have led to a material misstatement on a disclosure or that would have led to misrepresentation to shareholders. But that is not what's required to violate an SEC rule or regulation. The SEC rules and regulations, as we cite in our brief, go beyond fraud against shareholders and material misstatements. Right, but they're largely to deal with maximizing shareholder interest. Isn't that right? I mean, and the big question would be, like, it wasn't just the certification. It also included the interviews that he did. I think that's right, Your Honor. But the interview itself, if you look at Horton's interview, which my friend on the other side cites in their opposition brief at 12 and comes in JA665 to 670, specifically JA667, Mr. Horton takes notes that show that what he, and Mr. Horton's own notes say, that Katzel was reporting concerns that gaps in internal procedures meant that the ELT, that's the executive leadership team, was not getting accurate information about strategic transactions and strategy. That goes to the heart of... And where do you think is the SOX violation? That's a violation of the disclosure control and procedures rules that the SEC requires of issuers like AIG. And the other side does not even dispute that the disclosure controls and procedures rules can be violated even without a material misrepresentation or fraud against shareholders. And as we cite in our brief, the SEC and Activision Blizzard and First Financial are pursuing tens of millions of dollars in fines against companies for failures in these exact kinds of internal controls just because there's a risk that it will result in disclosure officials like the ELT, the executive leadership team, not getting accurate information that they need to have for material transactions like the transaction at issue in this case. And that's why we will argue to the jury that this shows that Katzel not only subjectively believed he was reporting a likely SOX violation, it also shows his belief was objectively reasonable and understandable as a SOX fraud risk. And the company acknowledges that Mr. Katzel was asked to convey these kinds of concerns by compliance officials who were seeking information about SOX fraud risks. The story AIG tells, though, is that Mr. Katzel's SOX fraud concerns were not even understandable as an attempt to convey a possible violation of an SEC rule or regulation. They would instead have us believe that despite having promoted Mr. Katzel four times and never having issued him a negative performance evaluation, it fired him shortly after he reported his concerns because the award-winning business unit he built and led was a disaster. He was the head of that business unit, and it was otherwise convenient to summarily fire him and have him escorted out of the building against his wishes. AIG's story is that it's mere happenstance that the company, A, contemporaneously updated its internal controls to address his concerns, and B, sought assurance the same day he was fired that a business competitor destroyed the AIG confidential information that was improperly shared in violation of those SEC-mandated controls. What do you make of the Code of Conduct certification? I mean, it's awfully broad. It's certified that he didn't know any violations of the Code of Conduct law or regulations, had no violations of the law or regulation to report. I mean, it covered a lot of ground. It does cover a lot of ground. It comes before he specifically reported concerns during the SOX fraud risk assessment process. Remind me of the temporal proximity. How long was it? I believe it was two months before, or maybe one month before, he reported his concerns during the SOX fraud risk assessment process. So he signs the certificate, and then in short order, it's your contention that he discovers these far-ranging violations? So, and you know, I think this is a good thing that the jury can consider in deciding whether he subjectively had this belief, but as the district court held in Rudolph. Well, let me, before we get to what the jury might consider, help me with what I might consider. Well, I would encourage your honor to consider that the actual language on the Code of Conduct certifications is he had nothing to report at that time. This is why the district court in Rudolph rejected the same argument brought by these same defense counsel in a case that's set to go to trial imminently, when it denied summary judgment to AIG based on the same exact Code of Conduct certification. So can we talk a little bit about one of our cases, Murray v. UBS Security? As you know, that is before the Supreme Court. That's going to be considering the standard of what constitutes retaliatory behavior. Can you suggest what we should do, given the pending Supreme Court decision on this? I think we win either way, your honor, that if it requires retaliatory animus, and I know your honor is well familiar with Murray, the panel case that came before this court, we would win on retaliatory animus based on the evidence we have in the record. But even if that, but if the Supreme Court does reverse, and I think that statistics show that it is likely to reverse when it grants in a case like that, and the government agrees that retaliatory animus is not required to show that it was a contributing factor under the statute, I think it is abundantly clear that a jury could find that it was a contributing factor here. So the question is, do you think we should wait? I think that the court can wait, and we would be happy to have the court wait, if that is the thing that this court believes that this case turns on. But I think it could also easily say that whether or not retaliatory animus is required is shown here. He was escorted out of the building against his wishes and is not allowed to say goodbye to his colleagues, despite his expressed desire to do so, despite other individuals who we pointed to in the record who were fired and given transition periods. Thank you, Wilbur. Good morning, Your Honor. May it please the court. Antonio Perez, Davis-Vulcan Award Will for Abilene AIG. I want to start with the factual context here. This claim arises out of AIG's evaluation and rejection of Appellant's plan to take his business unit, carve it out into a separate business of which he would have been the CEO, and in which he would have had equity. When the company rejected that plan, Mr. Katzel's plan, he thought the company had made a terrible mistake, and he raised his hand to say that the process the company had used was not sufficiently rigorous, that it had destroyed surveys, internal surveys that were conducted as part of the evaluation, and that it had shared company information with AIG's consultant, Accenture. Those were his only three complaints. You can see them enumerated at page 40 of Appellant's brief, and that recitation of those three complaints is based on Mr. Katzel's own testimony as to what he raised to compliance. That is not protected activity. Sarbanes-Oxley does not protect any form of internal complaint. And in this case, What about fashioning them as your colleague does about notice and disclosure? Why should they not be interpreted as such? Because, Your Honor, there isn't a shred of evidence that Mr. Katzel had any concern about disclosures at the time of his whistleblowing. The first time disclosures are mentioned is after he had already been terminated. The first time disclosure controls are mentioned is in this appeal. Disclosure controls are not mentioned once in his testimony, in the declaration he submitted. But certainly you're not asking us to create some rule that a potential whistleblower needs to use magic words. Is that correct? It is not a magic words test, Your Honor. It's about the nature of the concerns he expressed. Courts in this circuit regularly dismiss and grant summary judgment on whistleblower retaliation cases for concerning the wrong types of internal complaints. And rightly so. Because in 1514A, Congress imposed limits on the types of complaints that constitute protected activity. Not every internal complaint at a public company is protected activity. Failing to maximize shareholder value is not protected activity. Now, in all the record in this case, I'd like to focus on the fatal lack of evidence on subjective belief in a violation. We have 600 pages of deposition testimony from Mr. Katzel. He never once espouses a belief that an SEC rule had been violated or any enumerated violation had occurred. There's not one contemporaneous document in which he expresses such belief. No other witness has testified that he expressed such belief. They've all uniformly said he didn't say anything about SEC rules or any enumerated violation. And what's perhaps most striking is that in his own declaration, in opposition to our motion for summary judgment, in which our lead argument was the lack of evidence on subjective belief, he submitted a declaration. It's at Joint Appendix 2207, where he did not profess to have had a subjective belief that a violation had occurred. There is no evidence that he had such belief, and without that, his claim fails. And then I'd like to get to Judge Parker's questions about the certification, because my colleague made a factual error. The certification in which he said no violations of law or regulation to report was three days before his email to compliance, not months before. It was at exactly the same time. And he has testified in his deposition, and you can find this, we explain this evidence in our brief at page 30, that all the concerns he expressed to compliance, he already had at the time he completed his certification. He also testified at his deposition that he completed those certifications truthfully, based on his best knowledge and genuine belief. Those certifications, those seem to me to be very hard and very employer focused, right? Because you put employees in a position where they either are going to be where you are now, where these certifications are being used against them, or they're ready to set their relationships at their work on fire, and being able to say, yes, I found something, even when they're still not sure or something just doesn't smell right. I'm interested in knowing what beyond the certifications you think is enough to show that there's not objective evidence. And I'm assuming it's the interviews and what he was attesting to in the deposition, is that correct? It's two pieces, Your Honor. First is the lack of affirmative evidence. There's no evidence on which a jury could find that he had a subjective belief. He's never espoused such a belief. There's no document. Even in the notes of his compliance interview, there's no reference to an SEC rule violation or anything similar. And then the second is indeed the certification. And companies have a very strong interest in surfacing when their employees are aware of violations of law or violations of regulation. That's why these certifications exist. And it would be a perverse result if an employee, when asked directly by his employer, are you aware of any fraud, are you aware of any violation of law or regulation, to say no, and then turn around and say he was fired for reporting exactly that. And I would note, in addition, that testimony where he testified that he completed those certifications truthfully and based on his genuine belief and that the company is entitled to rely on them as reflecting his genuine beliefs, that's not referenced anywhere in my colleague's briefing. Can we turn to the question of the post-termination retaliation claim? Let's assume for a minute that we believe there might be a there there. Do we need to remand it so the court can at least address it? No, Your Honor, because on the post-employment retaliation claim, their principal argument on appeal has been that the filing of the OSHA complaint constitutes protected activity. That doesn't work as a timing matter because the adverse employment action that's alleged with respect to post-employment retaliation is the alleged denial of his post-employment equity. But the denial of his post-employment equity wasn't a denial, it was a forfeiture, as in this Court's decision in Call v. Hanover Direct. In order to receive that post-termination equity, he had to sign a release of claims. And without having signed that release of claims, he was never entitled to the shares that he claims he was wrongfully denied. We can talk about the timing and regarding when invested, but I do want to ask the same question I did about Murray. Do you think Murray, which will cover the scope of what constitutes retaliation, is something that might have something for us to look at, at least with respect to this case? No, Your Honor, because focusing on the post-employment retaliation for a moment, whether the test is contributing factor or retaliatory intent, there's no room for either of those things when the only reason as a contractual matter that he was not entitled to that equity was his failure to sign the release. And the same is true with respect to the alleged retaliation through his termination. The record on that is very clear and unrebutted that he was terminated because the new general counsel who came in, he had a new supervisor, came in and was not satisfied with him in that role, did not think he was the right person to lead the group going forward. This notion that they have that being escorted from the building was an aberration, that's not supported by the record. The former head of HR testified in this case, and he testified, that's standard operating procedure. That is the normal course of business at this company. And the examples he points to, anecdotal examples of two other employees who were not similarly escorted out, one of them was the former CFO who was continuing to provide services pursuant to transition plan, and the other was another employee who was continuing to do work for the company pursuant to a new contract. So yes, there are exceptions, but the standard policy was that employees are escorted out. Well, I just want to make sure that you're not asking us to take the jurisprudence too far. If we could say instead that he was instead bringing a religious discrimination claim, and that he was being fired on account of his religion, you wouldn't say that he couldn't bring a Title VII claim regarding the zeroing out, right? Because at some point, federal laws matter, and you can't contract around those things, right? Like, he would still have a Title VII claim if the issue was not that he had done whistleblowing, but he was being discriminated against for his religion. Your Honor, candidly, I have not studied the question of how it would work in the religious discrimination context. In this case, as a matter of the contract that he signed, which was in place— because they have a contract, right, when you have federal laws overimposed. I mean, you'd at least concede that. That's correct, Your Honor, and the limit that would be relevant here, if it applied, would be 21F17 that prohibits companies from impeding whistleblowing to the SEC. But the release that he was proffered to sign had an express carve-out, so he could have signed the release, gotten his equity, and gone straight to the SEC if he thought he had an SEC rule violation to report. What he's complaining about is that it's somehow improper for the company to ask him to release his claims against the company, and that is the same provision that this Court blessed and enforced in Call v. Hanover Direct. Your Honor, the case is really controlled by his own words. If you look at Joint Appendix 644, the email he sent, it's a far cry from reporting fraud or a shareholder SEC violation. What he was reporting was a failure to maximize shareholder value. That is not protected activity. They don't dispute that point of law, and they don't cite a single case in which an employee like this one who reported an alleged failure to maximize shareholder value was deemed to have engaged in protected activity. Thank you so much. Thank you, Your Honor. And we'll adjourn this for 32 minutes. Thank you, Your Honors. I'll start with the post-employment retaliation claim. The other side does not dispute that the district court simply just didn't rule on it despite our argument about it, and they also are incorrect. We have argued about how Section 806A2 prevents such retaliatory action because of the filing of a complaint. And while they talk about contractual language that apparently gives them the right to do this, what they don't address is that they didn't actually zero out his accounts until after he had filed his OSHA complaint, and they never turned over those emails to us that they had been exchanging with UBS. We had to get them from UBS directly. And I'll also note that the SEC is currently pursuing enforcement action under the rule that my friend on the other side cites as the reason that such severance agreements cannot prevent whistleblowing claims, but they never argued this in their briefing. And that is exactly what the SEC is going after companies for doing right now, much like the Title VII claim example. For interfering with whistleblowing claims. That is correct. And we didn't get to fully brief this because the other side did not actually address the argument that we raised in the opening brief. What would be the SEC's conceivable objection to a carve-out that allows people to make complaints to the SEC? Because that's not sufficient under the statute according to the SEC. It's not only the SEC. What would be sufficient? You have to have a carve-out for SEC and also for valid whistleblower claims under Section 806A2. Both of those cannot be ceased. And I believe that even their own quotation about the process not being sufficiently rigorous is language that's talking about a disclosure control and procedure. And I'll just end by saying, Your Honors, there is a world in which a jury might believe AIG's story, but the district court was not permitted to simply adopt AIG's telling without addressing any of the arguments or to the contrary or even indeed all his legal claims. Unless there are further questions? Thank you so much. Thank you, Your Honors.